**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

MICHAEL A. WRIGHT,
Plaintiff,

-against-

ONONDAGA COUNTY,
THE VILLAGE OF NORTH SYRACUSE,
DEPUTY TRE FESINGER,
OFFICER SHAWN DARROW,
OFFICER AUSTIN BAKER, and
UNIDENTIFIED ONONDAGA COUNTY DEPUTY SHERIFFS and NORTH SYRACUSE POLICE OFFICERS,
Defendants.

---------------------------------------------------------

**COMPLAINT**
JURY TRIAL DEMANDED
Civil Action No. 5:26-cv-2256 (AJB/CBF)

Plaintiff, Michael A. Wright, by his attorneys, William Sullivan, Esq., and Zennamo Litigation & Advocacy, PLLC, complaining of the Defendants, respectfully sets forth and alleges as follows:

## I. INTRODUCTION AND NATURE OF THE ACTION

1. This is a civil rights action arising from a law-enforcement response to a man in an acute mental-health crisis. On the afternoon of August 12, 2025, Plaintiff Michael A. Wright, then 33 years old, was hallucinating, terrified, and begging for help inside a small printing business in the Village of North Syracuse. A 911 caller reported a man "having a breakdown." The dispatchers repeatedly recorded that no weapons were seen. The responding officers themselves treated the call as a mental-health call and undertook to detain Mr. Wright for an emergency evaluation, not to arrest him for a crime.

2. Within approximately three minutes of their arrival, Defendants Deputy Tre Fesinger of the Onondaga County Sheriff's Office and Officers Shawn Darrow and Austin Baker of the North Syracuse Police Department went hands-on with Mr. Wright, shoved him into a countertop, and then, while Darrow and Baker each held one of his arms, Fesinger wrapped his arms around Mr. Wright, lifted him off his feet, swept his legs out from under him, and drove him to the floor. The maneuver hyperextended and destroyed Mr. Wright's left knee. Bone was visible through a gaping wound at the back of the knee the moment he hit the floor, and he bled so heavily that a deputy who arrived moments later concluded that the hemorrhage could be life-threatening.

3. The three officers nevertheless continued to struggle with Mr. Wright on the floor to force his hands behind his back. Baker pulled his hair. None of the three noticed or attended to the wound until the later-arriving deputy pointed it out and applied a tourniquet. Despite emergency vascular bypass surgery, fasciotomies, and further procedures at Upstate University Hospital, Mr. Wright's left leg could not be saved. It was amputated above the knee on August 21,

2025. Mr. Wright had no prior injury to the leg, was not under arrest, was not a danger to anyone and was never charged with a crime.

4. The Onondaga County Sheriff's Office thereafter reviewed the force at every level of its command and concluded that the force that cost Mr. Wright his leg was "lawful and within policy." Plaintiff asserts claims under 42 U.S.C. § 1983 for excessive force, failure to intervene, deliberate indifference to serious medical needs, unlawful seizure, and municipal liability; under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act for the failure to reasonably accommodate his obvious mental-health disability; and under New York law for assault, battery, violation of Civil Rights Law § 28, and negligence. He seeks compensatory damages for his catastrophic and permanent injuries, punitive damages against the individual Defendants, and attorneys' fees and costs.

## II. JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §§ 1983 and 1988; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This Court has original subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

6. This Court has supplemental jurisdiction over Plaintiff's claims under the laws of the State of New York pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as the federal claims and form part of the same case or controversy.

7. Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Onondaga County, within this District, and, upon information and belief, pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District.

## III. COMPLIANCE WITH CONDITIONS PRECEDENT

8. On November 7, 2025, Plaintiff served a timely notice of claim upon Onondaga County pursuant to General Municipal Law § 50-e and County Law § 52, and a timely notice of claim upon the Village of North Syracuse pursuant to General Municipal Law § 50-e. Each notice set forth the time, place, and manner in which the claims arose and the injuries sustained, and encompassed the claims asserted herein, including those arising from the conduct of each municipality's officers, agents, and employees.

9. Upon information and belief, the County has undertaken, by Resolution No. 168 of the Onondaga County Legislature adopted May 7, 1990, and by statute, to defend and indemnify its officers and employees, including Deputy Sheriffs, for acts and omissions within the scope of their employment, and the Village is obligated to defend and indemnify its police officers pursuant to General Municipal Law § 50-j. Service of the notices of claim upon the County and the Village therefore satisfied General Municipal Law § 50-e(1)(b) and County Law § 52 with respect to the claims asserted against the individual Defendants.

10. Plaintiff appeared for and testified at an examination pursuant to General Municipal Law § 50-h demanded by Onondaga County on January 20, 2026, and at an examination pursuant to General Municipal Law § 50-h demanded by the Village of North Syracuse on September 29, 2026.

11. More than thirty days have elapsed since service of each notice of claim, and the municipal Defendants have neglected or refused to adjust or pay the claims. This action is commenced within one year and ninety days after the happening of the events upon which the claims are based, as required by General Municipal Law § 50-i. All conditions precedent to the maintenance of Plaintiff's state-law claims have been performed, have occurred, or have been waived.

12. No notice of claim or other state-law condition precedent applies to Plaintiff's claims under federal law, and the foregoing allegations are not intended to impose any such condition upon those claims.

## IV. THE PARTIES

13. Plaintiff Michael A. Wright is a citizen of the United States and a resident of the Town of Clay, County of Onondaga, State of New York. At the time of the events alleged herein he was 33 years old and resided on Church Street in the Village of North Syracuse, a short walk from the business where he was injured.

14. Mr. Wright has a long history of episodic psychiatric impairment, including recurring periods of acute psychiatric crisis that, on several prior occasions in 2022, 2023, and 2024, resulted in his being taken to a hospital, without violence toward anyone. After the events alleged herein that impairment was formally diagnosed as unspecified bipolar disorder. When active, it substantially limits major life activities, including thinking, concentrating, perceiving, communicating, sleeping, caring for himself, and the normal operation of his brain. Mr. Wright was also in recovery from a substance-use disorder and had completed a treatment program in June 2025.

15. Defendant Onondaga County (the "County") is a municipal corporation organized and existing under the laws of the State of New York. The County provides law-enforcement services through the Onondaga County Sheriff's Office ("OCSO"), an administrative arm of the County that is not a separately suable entity. The Sheriff of Onondaga County and the officials to whom he has delegated final authority establish the County's policies, practices, and customs governing the use of force, the response to persons in mental-health crisis, the provision of medical attention to persons in custody, and the supervision, review, and discipline of deputies. Upon information and belief, the County receives federal financial assistance.

16. Defendant Village of North Syracuse (the "Village") is a municipal corporation organized and existing under the laws of the State of New York. The Village operates the North Syracuse Police Department ("NSPD"), an administrative arm of the Village, and employs Defendants Darrow and Baker. The Village, through its Board of Trustees and its Chief of Police, establishes the policies, practices, and customs of the NSPD governing the use of force, the response to persons in mental-health crisis, the provision of medical attention to persons in

custody, and the supervision, review, and discipline of its officers. Upon information and belief, the Village receives federal financial assistance.

17. Defendant Deputy Tre Fesinger (identified in the incident records by identification number 2975, and in some records as "Trey Fessinger") was at all relevant times a Deputy Sheriff employed by the County through OCSO and assigned to patrol unit 4503B. He is approximately six feet three inches tall and weighs approximately 260 pounds. He seized Mr. Wright, shoved him into a countertop, lifted him off his feet, performed the leg-sweep takedown that destroyed his knee, and participated in the ground restraint that followed. He is sued in his individual capacity. At all relevant times he acted under color of state law and within the scope of his employment.

18. Defendant Officer Shawn Darrow (identification number 0164) was at all relevant times a police officer employed by the Village through the NSPD, assigned to patrol unit 4101C, and was the primary responding officer on the call. He participated in seizing Mr. Wright, held one of Mr. Wright's arms during the takedown, and participated in the ground restraint and handcuffing that followed. He is sued in his individual capacity. At all relevant times he acted under color of state law and within the scope of his employment.

19. Defendant Officer Austin Baker (identification number 0162) was at all relevant times a police officer employed by the Village through the NSPD and assigned to patrol unit 4102C. He initiated the physical contact with Mr. Wright, joined Fesinger in shoving Mr. Wright into a countertop, held one of Mr. Wright's arms during the takedown, participated in the ground restraint and handcuffing, and, by his own account, grabbed Mr. Wright by the hair while Mr. Wright lay on the floor with a broken leg and an open wound. He is sued in his individual capacity. At all relevant times he acted under color of state law and within the scope of his employment.

20. Defendants Unidentified Onondaga County Deputy Sheriffs and North Syracuse Police Officers (the "Doe Defendants") are law-enforcement officers whose identities are presently unknown to Plaintiff and who personally participated in the use of force against Mr. Wright, observed excessive force with a realistic opportunity to intervene and failed to do so, or disregarded his obvious need for emergency medical attention while he was in their custody. The Doe Defendants are sued in their individual capacities, acted under color of state law and within the scope of their employment at all relevant times, and will be identified by amendment when their identities are ascertained through discovery.

## V. STATEMENT OF FACTS

21. On the morning of August 12, 2025, Mr. Wright underwent a root canal at a dental office in Cortland, New York, where he was given an anti-anxiety medication for the procedure. He returned to his home in North Syracuse at approximately 10:30 a.m.

22. Around midday, Mr. Wright, who had been in recovery, relapsed and used cocaine at his home. He then experienced a rapid and severe decompensation into an acute psychiatric crisis marked by vivid hallucinations, paranoia, and overwhelming fear. He believed that snakes and other things were crawling on his body and that someone was coming after him.

23. Mr. Wright's substance use contributed to the onset of this episode. It did not alter the nature of the crisis the officers encountered, the obviousness of his need for medical and psychiatric help, or the officers' obligations to respond to him with reasonable force and reasonable care.

24. In the early afternoon, Mr. Wright left his home on foot and, within minutes, came upon the rear parking lots of the businesses at 106 and 110 North Main Street, a short distance from his home. He was dressed in a t-shirt, shorts, and a hat, and he carried no weapon. He told the people he encountered that something was on him and asked for help.

25. Mr. Wright followed an employee of Plank Road Printing (also known as Kwik Kopy Printing), located at 106 North Main Street, North Syracuse, as she walked her dog back toward the business, and he entered the business behind her. Inside, he was frantic. He stated repeatedly, "get them off of me," "there's snakes on me," and "what is that on me." He took off his clothing in a desperate attempt to rid himself of what he believed was on his body. He asked the people in the store to call the police.

26. An employee of the business, Mark Hammond, repeatedly yelled at Mr. Wright to get out, told him he was trespassing, and tried to push him out of the store using "body leverage." Mr. Wright did not leave, because he could not coherently process what was happening around him or what was being said to him. He was begging for help. He did not strike, threaten, or attempt to injure anyone in the business; he was flailing his arms and asking for someone to get the things off of him. The owner of the business later declined to press charges, and no criminal charge was ever brought against Mr. Wright in connection with these events.

27. Beginning at 2:23 p.m., three members of the public called 911. The callers reported that a man was "having a breakdown," that he was "saying something is on me," that he had taken his clothes off, and that he was possibly under the influence of drugs. The dispatchers repeatedly recorded that no weapons were seen. The incident was classified as a "mental disoriented person" call, and OCSO classified it under its incident type "MENT," denoting a mental-health call.

28. Defendants Darrow (NSPD unit 4101C), Baker (NSPD unit 4102C), and Fesinger (OCSO unit 4503B) were dispatched at 2:23 p.m. and arrived at the business at 2:26 p.m. While en route, the officers were informed by dispatch that the subject was a man in apparent mental breakdown who had removed his clothing and that no weapons had been seen.

29. Upon arrival, the officers found Mr. Wright wearing only his underwear, pacing, sweating profusely, and stating that there were snakes on him. By their own accounts, each officer immediately recognized that Mr. Wright was in an altered mental state and in crisis. Baker described him as being in a "very intoxicated/PIC" (person-in-crisis) state. Fesinger described him as "highly erratic in an altered mental state." Darrow described him as "talking in a disoriented state" and "acting manic."

30. The officers did not treat the encounter as a criminal arrest. They decided to take Mr. Wright into custody for an emergency mental-health and medical evaluation, invoking Mental Hygiene Law § 9.41, which applies to a person who "appears to be mentally ill," and the

protective-custody provisions governing persons incapacitated by substances, Mental Hygiene Law § 22.09 (which the NSPD reports refer to as "PHL 2209"). The stated purpose of the custody was to get Mr. Wright help.

31. At 2:28 p.m., Darrow radioed dispatch to "start EMS" for a male who was "clearly" intoxicated. An ambulance was therefore already on its way to evaluate Mr. Wright before any force was used upon him.

32. The officers briefly told Mr. Wright that there were no snakes on him, told him to take a deep breath and calm down, and brought over a chair for him to sit in. Mr. Wright, in the grip of hallucinations, could not process or comply with these directions. He did not hear or understand that the people approaching him were police officers. Mr. Wright indicated that he could not sit because the snakes or other hallucinated creatures would get him.

33. Within moments, Baker "made physical contact" with Mr. Wright. Mr. Wright, who had his back to the officers, was touched and grabbed from behind by someone he did not recognize. Already terrified that someone was coming after him, he was startled, pulled his arms away, told the person grabbing him to get off of him, and moved toward one of the store's doors to get away from what he perceived to be a threat.

34. Fesinger and Baker then grabbed Mr. Wright from behind and, in Baker's words, prevented him from leaving by "shoving him into a counter top work area." Mr. Wright continued trying to pull free. The officers characterize his frightened efforts to get away as "shoving" and "resisting." He was not attacking the officers. He was a hallucinating, unarmed, nearly naked man trying to escape from people he did not recognize as police.

35. Fesinger then wrapped his arms around Mr. Wright in a bear hug and lifted him off his feet. While Darrow and Baker each held one of Mr. Wright's arms, Fesinger performed a leg sweep and drove Mr. Wright to the floor. Fesinger's own report states that he "performed a leg sweep take down" while the two NSPD officers "controlled each of" Mr. Wright's arms.

36. With both arms held by officers, his body lifted and off balance, and his legs swept out from under him, Mr. Wright had no ability to control or break his fall. As he went down he felt his left knee hyperextend and heard a series of loud snaps or pops in his leg. The pain was so overwhelming that he lost consciousness.

37. The takedown occurred within approximately three minutes of the officers' arrival and only moments after Darrow had summoned an ambulance to evaluate Mr. Wright.

38. The force of the takedown destroyed Mr. Wright's left knee. It fractured the bones of the leg, tore the ligaments of the knee, and tore the arteries and veins that supply blood to the lower leg. Bone was driven through the soft tissue at the back of the knee, leaving a large, gaping, open wound that bled profusely. Mr. Hammond, who watched the takedown, saw bone protruding from Mr. Wright's leg "as soon as the male was on the ground." The reports and presently available accounts do not establish the exact placement of the officers' bodies or the position of Mr. Wright's leg at the moment of injury, and Plaintiff does not adopt the officers' characterization of the maneuver as a properly controlled or reasonable one.

39. Before the takedown, Mr. Wright had been walking, running, and climbing over a fence. No witness observed any wound, bleeding, or injury to his leg before the officers took him down. He had no prior injury to, or condition of, the left leg. The catastrophic open injury appeared immediately upon, and was caused by, the officers' forcible takedown.

40. After Mr. Wright was on the floor, Fesinger, Darrow, and Baker continued to apply force to him in order to pull his arms behind his back. Baker described "multiple minutes of wrestling" with Mr. Wright on the floor before he was handcuffed.

41. Throughout that period Mr. Wright was lying prone, bleeding heavily from an open wound with exposed bone, and surrounded by three officers, with additional officers arriving. Any movements he made were the product of agony, terror, disorientation, and the involuntary responses of a gravely injured man. They posed no meaningful threat to the officers.

42. While Mr. Wright lay on the floor in that condition, Baker grabbed him by the hair and pulled it, by Baker's own account to "release pressure" so that Baker could reach Mr. Wright's wrist. Baker did not record this hair-pulling as a pain-compliance technique on his Subject Management Report, on which the box for "Pain Compliance" was left unchecked.

43. Throughout the struggle on the floor, Fesinger, Darrow, and Baker were focused on handcuffing Mr. Wright. None of them attended to the catastrophic wound and hemorrhage they inflicted on Mr. Wright.

44. Deputy Jonathan Christian (OCSO unit 4513B) responded to the business at approximately 2:27 p.m., parked in the rear, and walked around to the front. When he entered, Mr. Wright was prone on the floor and Darrow, Baker, and Fesinger were "trying to place Wright in handcuffs." Christian immediately observed "a severe traumatic injury to the left posterior area of his knee joint," "a large volume of blood coming out of the wound," and exposed bone, and he assessed that the volume of blood loss "could be life-threatening." Christian reported that "the other officers were…focuse[d] on controlling [Wright’s] hands."

45. At 2:29 p.m., Christian radioed dispatch to have EMS expedite its response, and he told Fesinger that Mr. Wright needed a tourniquet. Only then did Fesinger shift from handcuffing to assisting with the tourniquet, which Christian applied high on Mr. Wright's thigh and tightened until blood stopped flowing from the wound cavity. Christian radioed that the tourniquet had been applied at 2:30 p.m.

46. Even after the tourniquet was applied, the officers completed the handcuffing of Mr. Wright, with Christian holding Mr. Wright's head against the floor so that Darrow and Baker could pull his wrists behind his back.

47. Fesinger's written account of these events differs materially from Christian's. Fesinger reported that he first observed the injury only after Mr. Wright had been handcuffed and that he then "directed" Christian to apply the tourniquet. Christian's contemporaneous report, the dispatch log, and the sequence of radio transmissions establish that the handcuffing was still underway when Christian arrived; that it was Christian who recognized the hemorrhage, called for

the expedited ambulance, and called for the tourniquet; and that Fesinger, Darrow, and Baker had not yet responded to the wound.

48. The failure of Fesinger, Darrow, and Baker to respond to an obvious, uncontrolled hemorrhage while they held Mr. Wright on the floor permitted additional uncontrolled blood loss, prolonged the interruption of circulation to the lower leg, and exposed Mr. Wright to a grave risk of death and further injury. Upon information and belief, the delay significantly exacerbated his injury. The extent to which the delay contributed to the ultimate loss of the limb, as distinguished from the initial traumatic injury, will be established through medical evidence.

49. Mr. Wright remained handcuffed, prone, and tourniqueted on the floor until the ambulance arrived. He was in agony and continued to move; Fesinger braced his legs. The ambulance crew sedated him so that he could be moved, and he was transported to Upstate University Hospital in Syracuse.

50. At Upstate University Hospital, Mr. Wright was found to have suffered a catastrophic injury to the left knee and leg, including fractures, disruption of the knee joint, torn ligaments, and the tearing of the arteries and veins supplying the lower leg, with loss of circulation to the lower leg and compartment syndrome. On August 12, 2025, surgeons performed emergency vascular bypass surgery, harvesting a vein from his right leg in an effort to restore blood flow, and performed fasciotomies, cutting open both sides of the leg to relieve the pressure of the swelling. He was kept sedated for days.

51. A further procedure was performed to determine whether the muscle of the lower leg remained viable. It did not. The muscle and tissue of the lower leg had died from the loss of blood flow, and Mr. Wright faced a grave risk of infection from his open wounds. On August 21, 2025, Mr. Wright's left leg was amputated above the knee.

52. Mr. Wright also sustained lacerations and marks to his face, deep bruising along the inside of both arms, and a hematoma documented in his hospital records. He remained hospitalized for approximately two to three weeks.

53. Mr. Wright now lives with the permanent loss of his left leg. He uses a prosthesis; has endured repeated fittings and refittings as his residual limb has atrophied; has required crutches; has fallen repeatedly; has no sensation in the prosthetic limb; cannot walk more than short distances without pain and fatigue; and requires ongoing prosthetic, orthopedic, and physical-therapy care that he will need for the rest of his life, including the periodic replacement of costly prosthetic devices.

54. Before August 12, 2025, Mr. Wright was physically active. He worked five to six days a week on his feet, exercised regularly, played basketball, swam with his daughter, took her snowboarding and sledding, and traveled with her. He can no longer do these things as he did, and his relationship with his daughter and his enjoyment of life have been permanently diminished.

55. The incident has caused Mr. Wright severe and lasting psychological injury. He awoke in the hospital restrained to the bed, convinced that he had been kidnapped. He has since been diagnosed with post-traumatic stress disorder arising from the incident and with unspecified

bipolar disorder; has suffered anxiety, depression, grief, disrupted sleep, and the aggravation of his pre-existing psychiatric condition; and has required months of intensive substance-use and mental-health treatment.

56. Mr. Wright owns and operates a door-to-door sales business, Wright Way Marketing, LLC, which he formed in February 2025 and through which he personally sold community-solar and energy products and recruited, trained, and led a sales force of as many as thirty-five independent contractors in New York and other states. His work was performed almost entirely on foot, going door to door and shadowing and training his sales agents in the field.

57. Since the incident Mr. Wright has been unable to work in the field as he did, has had to cut his own salary, has lost the ability to recruit, train, and retain sales agents in the field, and has seen his sales force dwindle. He estimates his lost income at between $150,000 and $200,000, and he has sustained a permanent impairment of his earning capacity.

58. Substantial expenses for medical, hospital, surgical, rehabilitative, psychological, and prosthetic care have been incurred by and on behalf of Mr. Wright, and such expenses will continue to be incurred for the rest of his life.

59. The officers knew from the dispatch information, from their own observations, and from Mr. Wright's words and conduct that he was in acute psychiatric crisis, was hallucinating, and could not perceive, process, or respond to instructions as an unimpaired person would. They knew he was unarmed. They knew an ambulance had already been summoned to evaluate him. Mr. Wright was inside a small business with a limited number of exits, three officers were present, and additional units arrived within minutes.

60. Reasonable modifications to the officers' response were available and would not have fundamentally altered the nature of the services being provided or exposed anyone to a genuine and immediate danger. They included: approaching Mr. Wright from the front, slowly, with simple and consistent communication from a single officer; giving him time and space to process what was happening; refraining from abrupt physical contact from behind; containing the exits rather than immediately grabbing him; awaiting the arrival of the ambulance that had already been called, and of the additional units that arrived within minutes, before going hands-on; if physical restraint became necessary, using a controlled and coordinated restraint rather than lifting a large, hallucinating man off his feet and sweeping his legs while his arms were pinned; and, once he was injured, immediately reassessing the need for force and attending to his injuries.

61. The officers made none of these modifications. Instead, within approximately three minutes of arriving, they treated the manifestations of Mr. Wright's disability, his fear, his flailing, his inability to follow commands, and his attempt to get away from people he could not recognize as police as "resistance" to be overcome with escalating and unreasonable force. The failure to modify the response denied Mr. Wright the benefit of the protective and emergency services that the officers had undertaken to provide and caused him injury by reason of his disability.

62. OCSO's reporting and supervisory-review process reflected the same indifference. Fesinger's body-worn camera was knocked off during the encounter. The investigating supervisor, Sergeant Mark Schiano, was not notified of the use of force at the time of the incident. Sergeant

Robert Martin, who arrived as Mr. Wright was being loaded into the ambulance, was "unaware of the seriousness of the injury." No photographs of Mr. Wright's injuries were taken at the scene. Fesinger did not complete his Response to Resistance Report until August 14, 2025, two days after the incident.

63. On Fesinger's Response to Resistance Report, the boxes for "Actually Armed," "Reported to be Armed," "History of Violence," and "Physical threat/Attack on member or another" were not checked. The report records that the force used was a "Forcible Grounding" that caused a "Bone Fracture" to the "Left Leg," and that the force was used, among other stated reasons, to "Restrain for Subject's Safety" and for "Mental Health."

64. Sergeant Schiano reviewed the body-worn-camera footage of Fesinger and Darrow and concluded that Fesinger's conduct "appears to be within" OCSO policies and procedures. The Division Commander concurred on September 3, 2025. The Internal Affairs review recommended findings of "Within Policy" and "Lawful." The Department Chief entered the final finding that the force was "Within Policy" and "Lawful," writing: "Force applied was lawful and within policy. Ancillary policy violations addressed via Supervisory Memoranda." No training was recommended, and no discipline was imposed for the force used.

65. By these determinations, the County's final policymakers for law-enforcement policy, after reviewing the officers' accounts and the investigating supervisor's findings based on the body-worn-camera footage, approved both Fesinger's use of a lifting bear-hug and leg-sweep takedown upon an unarmed, hallucinating man in mental-health crisis whose arms were pinned by two other officers, and the basis for it, and affirmatively determined that such force conformed to County policy. Those determinations confirm that the force used against Mr. Wright was the force that County policy, training, and custom authorized for persons in psychiatric crisis who do not comply with commands.

66. The Village likewise conducted a supervisory review of Baker's Subject Management Report, which documented that Baker and Fesinger shoved Mr. Wright into a countertop and that Baker pulled Mr. Wright's hair while he lay on the floor with a broken leg and an open wound. Upon information and belief, the Village's review resulted in no finding of any policy violation, no corrective action, no discipline, and no retraining.

67. Upon information and belief, at the time of the incident neither the County nor the Village maintained adequate policies or training governing the use of force upon, and the de-escalation of encounters with, persons in apparent mental-health crisis; the circumstances in which officers should delay hands-on contact pending the arrival of emergency medical personnel already summoned; the recognition of, and response to, serious injuries inflicted during a use of force; or the duty to intervene to stop a fellow officer's use of excessive force. The conduct of three officers from two agencies, acting together and without hesitation in the manner described above, and the subsequent approval of that conduct by each agency, reflect those deficiencies.

68. Each individual Defendant is sued for his own participation in the force, his own failure to intervene, and his own disregard of Mr. Wright's medical needs, as specified below. The County's liability under federal law is based upon its own policies, customs, and deliberate indifference, and its liability under the disability-rights statutes and Civil Rights Law § 28 is based

upon duties those statutes impose upon it directly. The Village is liable under federal law for its own policies, customs, and deliberate indifference, and under New York law both directly and vicariously for the torts of Darrow and Baker committed within the scope of their employment.

**FIRST CAUSE OF ACTION: Excessive Force (42 U.S.C. § 1983; Fourth Amendment) Against Defendants Fesinger, Darrow, Baker, and the Doe Defendants**

69. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

70. The seizure of Mr. Wright for the purpose of an emergency mental-health evaluation and protective custody was a seizure of his person within the meaning of the Fourth Amendment, which is applicable to the Defendants through the Fourteenth Amendment. The Fourth Amendment required that any force used to effect and maintain that seizure be objectively reasonable under the totality of the circumstances.

71. Fesinger, Darrow, and Baker each personally and intentionally applied force to Mr. Wright. Baker initiated physical contact with him from behind. Fesinger and Baker shoved him into a countertop. Darrow and Baker held his arms while Fesinger lifted him off his feet and swept his legs out from under him, driving him to the floor. All three continued to apply force to him on the floor for several minutes while he lay bleeding from an open wound with exposed bone, and Baker pulled his hair.

72. Under the totality of the circumstances, including that the officers were responding to a mental-health call for the protective purpose of getting Mr. Wright help; that he was obviously in psychiatric crisis and unable to comprehend commands; that he was unarmed and nearly naked; that he was trying to get away from the officers rather than attack them; that an ambulance had already been summoned; and that three officers were present with more arriving; and that the business could readily have been contained—all go to establish the degree and manner of the force used were objectively unreasonable and grossly disproportionate to any legitimate need.

73. Even assuming that some force was reasonably necessary to prevent Mr. Wright from leaving the business, lifting a hallucinating man weighing approximately 250 pounds off his feet and sweeping his legs while two other officers pinned his arms, so that he could not break his fall, was not a reasonable means of doing so. The continued application of force on the floor, including Baker's hair-pulling, to a prone and bleeding man with a catastrophic open leg injury, was likewise objectively unreasonable.

74. The individual Defendants acted intentionally, and with malice or with reckless and callous indifference to Mr. Wright's federally protected rights.

75. As a direct and proximate result of the individual Defendants' use of excessive force, Mr. Wright suffered the catastrophic injury to his left leg, the amputation of the leg, and the other physical, psychological, and economic injuries described above. Plaintiff is entitled to compensatory damages, nominal damages in the alternative, punitive damages against the individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION: Failure to Intervene (42 U.S.C. § 1983; Fourth Amendment) Against Defendants Fesinger, Darrow, Baker, and the Doe Defendants**

76. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

77. Every law-enforcement officer has an affirmative duty to intervene to prevent or stop the use of excessive force by a fellow officer in his presence when he knows or has reason to know that excessive force is being used and has a realistic opportunity to intervene.

78. This cause of action is pleaded in the alternative to direct participation. To the extent any individual Defendant did not himself apply a particular application of excessive force described above, he observed it, knew or had reason to know that it was excessive, and had a realistic opportunity to prevent or stop it. The ground restraint lasted several minutes; the officers were side by side and within arm's reach of one another and of Mr. Wright; and the continued forcible manipulation of a man with an obviously catastrophic injury, and Baker's hair-pulling, could have been stopped with a word or by any officer discontinuing his own participation.

79. Each such Defendant nevertheless failed to take any reasonable step to prevent or curtail the excessive force, in deliberate or reckless disregard of Mr. Wright's rights.

80. As a direct and proximate result, Mr. Wright suffered avoidable physical injury, pain, and emotional suffering. Plaintiff is entitled to compensatory damages, nominal damages in the alternative, punitive damages against the individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION: Deliberate Indifference to Serious Medical Needs (42 U.S.C. § 1983; Fourteenth Amendment) Against Defendants Fesinger, Darrow, Baker, and the Doe Defendants**

81. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

82. From the moment the officers seized Mr. Wright and took him to the floor, he was in their physical custody and wholly dependent upon them. The Due Process Clause of the Fourteenth Amendment entitled him to reasonable care for his serious medical needs while in that custody, and prohibited the officers from acting, or failing to act, with objective recklessness toward a condition that they knew, or should have known, posed an excessive risk to his health or safety.

83. The open wound at the back of Mr. Wright's knee, with exposed bone and massive, uncontrolled hemorrhage, was an objectively serious medical need that presented an immediate and substantial risk of death and of further grave injury. It was obvious to a deputy who walked into the room, without any examination, within seconds of entering.

84. Fesinger, Darrow, and Baker were holding Mr. Wright on the floor and were inches from the wound. They knew, or should have known, of the hemorrhage and of the risk it posed. They nonetheless continued to concentrate on forcing his hands behind his back, and did not assess the wound, control the bleeding, or summon expedited emergency care until Christian did so. Their conduct was objectively reckless, not merely negligent.

85. The ambulance that Darrow had summoned to evaluate Mr. Wright's intoxication before the takedown did not discharge the officers' duty to recognize and respond to a new, obvious, and life-threatening injury that they themselves had inflicted.

86. As a direct and proximate result of this deliberate indifference, Mr. Wright suffered additional uncontrolled blood loss, prolonged loss of circulation to the lower leg, significant exacerbation of his injury, and avoidable pain and suffering, and was exposed to a grave risk of death. Plaintiff is entitled to compensatory damages for the harm attributable to the delay, nominal damages in the alternative, punitive damages against the individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION: Unlawful Seizure (42 U.S.C. § 1983; Fourth Amendment) Against Defendants Fesinger, Darrow, Baker, and the Doe Defendants (Pleaded in the Alternative)**

87. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

88. This cause of action is pleaded in the alternative to Plaintiff's excessive-force claim. The seizure and detention of Mr. Wright for an involuntary mental-health evaluation was a seizure within the meaning of the Fourth Amendment, applicable to the Defendants through the Fourteenth Amendment, whether characterized as criminal, protective, or for emergency evaluation.

89. To seize and detain a person for mental-health reasons, an officer must have probable cause to believe that the person poses a substantial risk of serious physical harm to himself or others. An uncorroborated report, and conduct that is merely irrational, disoriented, or uncooperative, do not by themselves establish the requisite dangerousness.

90. At the time the officers seized Mr. Wright, the information available to them—a dispatch describing a man in apparent mental breakdown, the repeated notations that no weapons were seen, and their own observation of an unarmed, and a nearly naked man asking for help and trying to move away did not establish probable cause that Mr. Wright presented a substantial risk of serious physical harm to himself or others sufficient to justify the forcible seizure and the degree of force used to effect it.

91. To the extent the seizure was not supported by probable cause of dangerousness, it was an unreasonable seizure in violation of the Fourth Amendment, and the individual Defendants are liable for the injuries proximately caused thereby. Plaintiff is entitled to compensatory damages, nominal damages in the alternative, punitive damages against the individual Defendants, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FIFTH CAUSE OF ACTION: Municipal Liability (42 U.S.C. § 1983; Monell) Against Defendants Onondaga County and the Village of North Syracuse**

92. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

93. The Sheriff of Onondaga County is the County's final policymaker with respect to the law-enforcement policies, practices, training, supervision, and discipline of OCSO deputies, and the Department Chief and command staff who reviewed and approved the force used upon Mr. Wright exercised that authority on the Sheriff's behalf. The Village's Board of Trustees and Chief of Police are the Village's final policymakers with respect to the law-enforcement policies, practices, training, supervision, and discipline of NSPD officers.

94. The County maintained, and implemented through Fesinger, a policy, practice, and custom of authorizing deputies to forcibly ground persons in apparent psychiatric crisis who do not comply with commands, including by means of lifting and leg-sweep takedowns, without adequate limitations requiring that the degree and manner of force be proportionate to the actual threat presented, without adequate requirements that deputies attempt and exhaust less injurious alternatives when dealing with a person in mental-health crisis who is unarmed and contained, and without adequate requirements that deputies reassess the need for force once the person is on the ground or injured. The County's unanimous determination at every level of review, including by its final policymaker, that Fesinger's force was "within policy" establishes that the force used upon Mr. Wright was the force the County's policy authorized.

95. The County, through its final policymaker, also ratified Fesinger's use of force and the basis for it. After reviewing the officers' accounts and the body-worn-camera footage, the County's command staff and Department Chief approved the force as lawful and within policy, recommended no training, and imposed no discipline for the force, notwithstanding that it was used upon an unarmed, hallucinating man in a mental-health crisis and cost him his leg. The County thereby adopted the force as its own policy.

96. The County and the Village each failed to train and supervise their officers with respect to responding to persons in mental-health crisis; de-escalation and the use of time, distance, and containment; the circumstances in which officers should delay hands-on contact pending the arrival of emergency medical personnel already summoned; the use of takedown techniques upon persons who are impaired or whose arms are controlled; the recognition of, and immediate response to, serious injuries inflicted during a use of force; and the duty to intervene. Encounters between patrol officers and persons in acute psychiatric crisis are a recurring and known feature of police work, and the likelihood that officers untrained in responding to such persons will use unnecessary and injurious force upon them is so obvious that the failure to train and supervise constitutes deliberate indifference to the constitutional rights of persons with whom the officers come into contact.

97. The Village, through its final policymakers, further maintained a practice and custom of failing to supervise and discipline its officers with respect to the use of force upon

persons in crisis, as reflected in its review of Baker's Subject Management Report which documented the shoving of Mr. Wright into a countertop and the pulling of his hair while he lay injured on the floor without any finding of a violation, corrective action, discipline, or retraining.

98. The foregoing policies, practices, customs, and failures of the County and the Village were the moving force behind the violations of Mr. Wright's Fourth and Fourteenth Amendment rights alleged in the First through Fourth Causes of Action. They authorized and governed the manner in which the individual Defendants responded to Mr. Wright's alleged noncompliance, escalated to the injurious takedown, continued the restraint without reassessment, and disregarded his obvious injury.

99. As a direct and proximate result, Mr. Wright suffered the constitutional deprivations and injuries described above. Plaintiff is entitled to compensatory damages, nominal damages in the alternative, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988. No punitive damages are sought against the County or the Village.

**SIXTH CAUSE OF ACTION: Failure to Reasonably Accommodate a Disability (Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132) Against Defendants Onondaga County and the Village of North Syracuse**

100. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

101. The County and the Village are each a "public entity" within the meaning of 42 U.S.C. § 12131(1). Their responses to calls for emergency assistance, their taking of persons into protective custody for mental-health evaluation pursuant to Mental Hygiene Law §§ 9.41 and 22.09, and their custodial care of such persons are services, programs, or activities of a public entity within the meaning of 42 U.S.C. § 12132.

102. At the time of the encounter, Mr. Wright was a qualified individual with a disability within the meaning of 42 U.S.C. §§ 12102 and 12131(2). He had an actual mental impairment demonstrated by an episodic psychiatric condition subsequently diagnosed as unspecified bipolar disorder which, when active, substantially limits major life activities including thinking, concentrating, perceiving, communicating, sleeping, caring for himself, and the operation of his brain, and which was active during the encounter. He was otherwise eligible to receive the protective and emergency-assistance services that the officers had undertaken to provide. This cause of action rests upon Mr. Wright's actual disability, and not upon the proposition that the current illegal use of drugs is itself a disability.

103. The County and the Village, through their responding officers, knew of Mr. Wright's disability and of the resulting need to modify their response. The dispatch information described a man having a mental breakdown; the officers themselves immediately recognized that he was in an altered mental state and in crisis; and they invoked Mental Hygiene Law § 9.41, which by its terms applies to a person who appears to be mentally ill. The need for accommodation was obvious, and no formal diagnosis or coherent verbal request was necessary to trigger the duty to accommodate. The officers possessed the authority at the scene to modify their communication, manner of approach, timing, level and manner of restraint, and response to injury.

104. The County and the Village failed to make the reasonable modifications described above, which would have permitted the officers to pursue protective custody and emergency evaluation while avoiding the disability-related escalation and unnecessary injury that occurred, and which would not have fundamentally altered the nature of the services provided or required the officers to tolerate a genuine and immediate threat to the safety of any person. Instead, the officers treated the manifestations of Mr. Wright's disability as grounds for the disproportionate force and continued pain compliance alleged above.

105. By reason of his disability, the County and the Village thereby excluded Mr. Wright from participation in, and denied him the benefits of, their services, programs, and activities, and subjected him to discrimination, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130. This cause of action challenges the officers' failure to accommodate Mr. Wright's disability during the encounter, and not the adequacy of any medical treatment provided to him for the resulting injury.

106. The County and the Village acted with deliberate indifference to Mr. Wright's federally protected rights. Officials with authority to address the need for accommodation had actual knowledge of his obvious disability and of the substantial likelihood that an unmodified, force-first response would deny him meaningful access to the services at issue and cause him serious harm, and they failed to act upon that knowledge. Their discrimination was therefore intentional within the meaning of the governing law.

107. To the extent any Defendant contends that Mr. Wright's conduct arose from the current illegal use of drugs, Plaintiff invokes the protection of 42 U.S.C. § 12210(c), under which an individual is not denied health services, or services provided in connection with drug rehabilitation, on the basis of current illegal drug use if the individual is otherwise entitled to such services.

108. As a direct and proximate result of this discrimination, Mr. Wright suffered the physical injuries and economic losses described above. Plaintiff is entitled to compensatory damages for those injuries and losses, nominal damages in the alternative, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205. Plaintiff does not seek punitive damages under this cause of action.

**SEVENTH CAUSE OF ACTION: Disability Discrimination (Section 504 of the Rehabilitation Act, 29 U.S.C. § 794) Against Defendants Onondaga County and the Village of North Syracuse**

109. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

110. Upon information and belief, at all relevant times the County and the Village each received federal financial assistance, and their law-enforcement operations are "programs or activities" within the meaning of 29 U.S.C. § 794(b).

111. Mr. Wright was an otherwise qualified individual with a disability within the meaning of 29 U.S.C. §§ 705(20) and 794. Solely by reason of the disability-related limitations for which reasonable modifications were required, the County and the Village denied him meaningful

access to their protective-custody and emergency-assistance services and subjected him to discrimination, by failing to make the reasonable modifications described above.

112. The County and the Village, through personnel with authority to modify the response, had actual knowledge of Mr. Wright's need for accommodation and acted with deliberate indifference to the strong likelihood that their failure to accommodate him would violate his federally protected rights.

113. As a direct and proximate result, Mr. Wright suffered the physical injuries and economic losses described above. Plaintiff is entitled to compensatory damages for those injuries and losses, nominal damages in the alternative, and reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 794a(b). Plaintiff does not seek punitive damages under this cause of action. The Sixth and Seventh Causes of Action are alternative and overlapping bases of liability, and Plaintiff seeks no duplicative recovery.

**EIGHTH CAUSE OF ACTION: Assault (New York Common Law) Against Defendants Fesinger, Darrow, Baker, the Doe Defendants, and the Village of North Syracuse**

114. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

115. By grabbing at, shoving, lifting, and taking down Mr. Wright, and by continuing to apply force to him on the floor, Fesinger, Darrow, and Baker intentionally placed Mr. Wright in apprehension of imminent harmful and offensive physical contact. Mr. Wright experienced terror for his physical safety and attempted to move away from the threatened contact.

116. The force threatened and used exceeded the force that was reasonably necessary under the circumstances to take Mr. Wright into protective custody and was without lawful justification, privilege, or consent. The stated protective purpose of the custody did not privilege the use of force that was unreasonable and excessive.

117. The Village is vicariously liable for the assaults committed by Darrow and Baker, who at all relevant times acted within the scope of their employment as Village police officers and in furtherance of the Village's business. In the alternative, and upon information and belief, to the extent the County has by local law, resolution, or otherwise assumed responsibility for the tortious acts of the Sheriff and his deputies, the County is vicariously liable for the assault committed by Fesinger within the scope of his employment.

118. As a direct and proximate result, Mr. Wright suffered apprehension, fear, physical injury, pain, and emotional harm. Plaintiff is entitled to compensatory damages, and to punitive damages against the individual Defendants, whose conduct was wanton, reckless, and in conscious disregard of Mr. Wright's rights.

**NINTH CAUSE OF ACTION: Battery (New York Common Law) Against Defendants Fesinger, Darrow, Baker, the Doe Defendants, and the Village of North Syracuse**

119. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

120. Fesinger, Darrow, and Baker each intentionally made harmful and offensive bodily contact with Mr. Wright without his consent: Baker initiated physical contact with him from behind; Fesinger and Baker shoved him into a countertop; Darrow and Baker seized and held his arms; Fesinger lifted him off his feet, swept his legs, and drove him to the floor; all three forcibly manipulated his body and arms on the floor; and Baker pulled his hair. These were intentional contacts, irrespective of whether the officers intended the full extent of the resulting injury.

121. The nature, degree, and manner of the contact exceeded any privilege to use reasonable force to take Mr. Wright into protective custody for evaluation, and were without lawful justification. Plaintiff's claim concerns the excessive and unreasonable force actually used, not the proposition that every nonconsensual protective restraint is a battery.

122. The Village is vicariously liable for the batteries committed by Darrow and Baker, who at all relevant times acted within the scope of their employment as Village police officers and in furtherance of the Village's business. In the alternative, and upon information and belief, to the extent the County has by local law, resolution, or otherwise assumed responsibility for the tortious acts of the Sheriff and his deputies, the County is vicariously liable for the battery committed by Fesinger within the scope of his employment.

123. As a direct and proximate result of the battery, Mr. Wright suffered the catastrophic injury to his left leg and its amputation, and the other physical, psychological, and economic injuries described above. Plaintiff is entitled to compensatory damages, and to punitive damages against the individual Defendants, whose conduct was wanton, reckless, and in conscious disregard of Mr. Wright's rights.

**TENTH CAUSE OF ACTION: Failure to Provide Reasonable Medical Attention to a Person in Custody (New York Civil Rights Law § 28) Against Defendants Fesinger, Darrow, Baker, the Doe Defendants, Onondaga County, and the Village of North Syracuse**

124. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

125. New York Civil Rights Law § 28 provides that when a person is under arrest or otherwise in the custody of a police officer, peace officer, or other law-enforcement representative or entity, such officer, representative, or entity has a duty to provide attention to the medical and mental-health needs of such person, and to obtain assistance and treatment of such needs, which are reasonable and provided in good faith under the circumstances. The statute affords a cause of action for actual damages, costs, and reasonable attorneys' fees to any person who has not received such attention, assistance, or treatment and who has suffered serious physical injury or significant exacerbation of an injury or condition as a result.

126. From the moment the officers seized him and took him to the floor, Mr. Wright was in the custody of Fesinger, Darrow, and Baker, and of the County and the Village, the law-enforcement entities through whose officers that custody was exercised. He had an obvious and immediate need for attention to a potentially life-threatening hemorrhage, as well as an obvious need for attention to his acute mental-health condition.

127. Fesinger, Darrow, and Baker failed to provide reasonable and good-faith attention to those needs. They continued to pursue handcuffing while the visible, severe bleeding went unaddressed, and they did not recognize, assess, or act upon the hemorrhage until another deputy did so. The County and the Village failed to discharge the statutory custodial duty owed by them as the law-enforcement entities in whose custody Mr. Wright was held. The tourniquet and the emergency medical treatment that followed are not themselves alleged to have violated the statute.

128. As a result of that failure, Mr. Wright sustained additional uncontrolled blood loss and, upon information and belief, serious physical injury and significant exacerbation of his traumatic injury, including avoidable aggravation of the vascular compromise of his leg and avoidable physical suffering. The exacerbation, and its contribution to the loss of the limb, will be established through medical evidence.

129. Plaintiff is entitled to actual damages, costs, and reasonable attorneys' fees pursuant to Civil Rights Law § 28. This statutory cause of action is in addition to, and does not supersede, Plaintiff's other rights and remedies, and Plaintiff seeks no duplicative recovery.

**ELEVENTH CAUSE OF ACTION: Negligent Post-Injury Custodial Care (New York Common Law; Pleaded in the Alternative) Against Defendants Fesinger, Darrow, Baker, the Doe Defendants, and the Village of North Syracuse**

130. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

131. This cause of action is pleaded in the alternative to the allegations that the individual Defendants' post-injury conduct was reckless or deliberately indifferent. It is directed solely to the officers' care of Mr. Wright after he was injured, and it does not recharacterize the intentional takedown, restraint, or hair-pulling as negligent.

132. By seizing Mr. Wright, taking him to the floor, and holding him there in their physical custody and control after his leg had been catastrophically injured, the individual Defendants assumed a special duty, owed to Mr. Wright individually and not merely to the public at large, to exercise reasonable care for his safety and to attend to his observable medical needs. That duty arose from their direct custody and control of a helpless and gravely injured person, from their affirmative undertaking to obtain emergency medical assistance for him, from his complete dependence upon them, and from the statutory duty imposed by Civil Rights Law § 28 and the protective purposes of Mental Hygiene Law §§ 9.41 and 22.09, which are intended to protect the class of persons in crisis to which he belonged.

133. The individual Defendants breached that duty by failing to recognize, assess, and attend to the visible wound and substantial bleeding while they continued to concentrate on

handcuffing Mr. Wright. With three officers present and more arriving, reasonable custodial care required that the control of hemorrhage be addressed concurrently with any restraint reasonably necessary for safety.

134. The Village is vicariously liable for the negligence of Darrow and Baker, who at all relevant times acted within the scope of their employment as Village police officers. In the alternative, and upon information and belief, to the extent the County has by local law, resolution, or otherwise assumed responsibility for the negligent acts of the Sheriff and his deputies, the County is vicariously liable for the negligence of Fesinger within the scope of his employment.

135. As a direct and proximate result of this negligence, Mr. Wright sustained additional uncontrolled blood loss, avoidable physical injury and pain, and aggravation of his condition, distinct from the injury caused by the force itself. Plaintiff is entitled to compensatory damages for the incremental harm proved to have resulted from that negligence, without duplicative recovery. No punitive damages are sought under this cause of action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Michael A. Wright demands judgment against the Defendants, jointly and severally on the causes of action applicable to each, as follows:

A. compensatory damages in an amount to be determined at trial, including damages for past and future physical pain and suffering, permanent disability, disfigurement, loss of enjoyment of life, emotional and psychological injury, medical, hospital, rehabilitative, and prosthetic expenses, lost earnings, and impairment of earning capacity, on each cause of action permitting such recovery and without duplication;

B. nominal damages in the alternative on the federal claims, if a violation is established without proof of compensatory damages;

C. punitive damages against the individual Defendants on the First, Second, Third, Fourth, Eighth, and Ninth Causes of Action;

D. reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 12205, 29 U.S.C. § 794a(b), New York Civil Rights Law § 28, and any other applicable provision of law;

E. prejudgment interest to the extent permitted by the law governing each claim, and post-judgment interest pursuant to 28 U.S.C. § 1961;

F. the costs and disbursements of this action; and

G. such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Dated: Ilion, New York
November 3, 2026

Respectfully submitted,

Cory Zennamo

Cory Zennamo, Esq.
Zennamo Litigation & Advocacy, PLLC
Attorneys for Plaintiff Michael A. Wright
47 West Street
Ilion, New York 13357
Phone: (315) 520-8838
Info@zennamo.legal
NDNY Bar Roll No.: 702282